**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ERIKA JUDITH QUEZADA BRAVO,**<br><br>*Petitioner*,<br><br>v.<br><br>**WARDEN, ELIZABETH CONTRACT DETENTION FACILITY,**<br><br>*Respondent*. | No. 26-cv-12309<br><br>**OPINION** |

**O'HEARN, District Judge.**

Petitioner Erika Judith Quezada Bravo ("Petitioner") is a noncitizen who was recently detained at the Elizabeth Contract Detention Facility in Elizabeth, New Jersey. Through counsel, Petitioner filed an Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. (ECF No. 22). The Court granted the Petition and ordered Petitioner released on October 28, 2026. (ECF No. 29). This Opinion supplements the Court's Order.

## I. BACKGROUND

Petitioner is a thirty-four-year-old native and citizen of Nicaragua who entered the United States on or about October 19, 2021. (Am. Pet., ECF No. 22 ¶ 12; Bond Evidentiary Packet ("Bond Packet"), ECF No. 28 at 38). Petitioner alleges that she fled Nicaragua after experiencing political persecution arising from her opposition to the government. (Bond Packet, ECF No. 28 at 38). Following her arrival in the United States, Petitioner underwent a credible fear interview and immigration officials determined that she had established a credible fear of persecution or torture. (*Id.* at 15, 38). On December 16, 2021, Immigration and Customs Enforcement ("ICE") released Petitioner on parole, subject to reporting requirements. (*Id.* at 36, 38).

Following her release, Petitioner relocated to New Jersey, where she has resided for approximately five years. (*Id.* at 38–39). During that time, Petitioner pursued her immigration proceedings, maintained employment, paid taxes, and developed ties to her community. (*Id.* at 38–40, 88–148). Petitioner avers that, notwithstanding her relocation to New Jersey, she traveled to Florida on April 14, 2022, to attend a mandatory reporting appointment with immigration authorities. (*Id.* at 38). She subsequently applied for asylum on June 13, 2023, and appeared for her scheduled biometrics appointment on July 10, 2023. (*Id.* at 32–38). Her asylum application remains pending. (Am. Pet., ECF No. 22 ¶¶ 12–15).

On September 13, 2026, Petitioner was arrested following a domestic dispute with her then-boyfriend at their residence in Long Branch, New Jersey. (ECF No. 28 at 39–40, 156–65). She was charged with simple assault and criminal mischief arising from allegations that she scratched her boyfriend's arm and damaged his cellphone. (*Id.* at 156–65; Gov't Ex. A, ECF No. 6-1). Petitioner disputes the allegations and maintains that she was the victim of domestic violence. According to her account, her boyfriend arrived at their residence intoxicated, damaged her belongings, threatened her, and then physically assaulted her when she attempted to contact the police. (Am. Pet., ECF No. 22 ¶¶ 16–19; Bond Packet, ECF No. 28 at 39–40). Petitioner alleges that she sustained injuries to her hand during the altercation and ultimately called 911 seeking assistance. (*Id.*). She maintains that her boyfriend falsely accused her of assaulting him, resulting in her arrest. (*Id.*).

Upon review of the pending charges, a New Jersey municipal court authorized Petitioner's release following her arrest. (Am. Pet., ECF No. 22 ¶ 18; Bond Hr'g Tr., ECF No. 25-1 at 6). The state court's pretrial Public Safety Assessment reflects no prior criminal convictions, no prior failures to appear, and no prior violent convictions. (Bond Packet, ECF No. 28 at 164–65). The

charges remain pending. The record does not reflect that any protective or restraining orders were issued. Although the state court authorized her release, Petitioner was instead transferred to ICE custody on September 14, 2026, and detained at the Elizabeth Contract Detention Facility. (Am. Pet., ECF No. 22 ¶ 18; Gov't Resp., ECF No. 6 at 1).

Petitioner commenced this action pursuant to 28 U.S.C. § 2241, challenging the legality of her immigration detention. (ECF No. 1). In response, counsel for Respondent represented to the Court that Petitioner was detained pursuant to 8 U.S.C. § 1226(a), that her pending criminal charges did not subject her to the mandatory detention provisions of § 1226(c), and that she was therefore "undoubtedly" entitled to seek bond before an IJ. (ECF No. 6 at 1–3). Relying on those representations, the Court permitted Petitioner's scheduled September 29, 2026, bond hearing to proceed. (ECF No. 8).

At the September 29 hearing, however, the Department of Homeland Security ("DHS") advanced a position directly contrary to the representations made to this Court. Specifically, DHS argued that Petitioner was subject to detention under 8 U.S.C. § 1225(b) and was categorically ineligible for bond pursuant to *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019).[1] (Pet'r's Letter, ECF No. 12). The Immigration Judge (IJ) accepted that position and denied Petitioner's bond request for lack of jurisdiction, without conducting an individualized assessment of dangerousness or flight risk. (*Id.*).

On September 30, 2026, the Court ordered Respondent to show cause why Petitioner should not be immediately released or, alternatively, to release her and file confirmation with the Court. (ECF No. 14). The Court explained that Respondent's position before the IJ directly

---

[1] In *Matter of M-S-*, the Attorney General determined that noncitizens initially placed in expedited removal proceedings under 8 U.S.C. § 1225(b)(1) who subsequently establish a credible fear of persecution or torture are nevertheless ineligible for bond hearings.

contradicted the position Respondent had advanced in this litigation and upon which the Court had relied in permitting the bond hearing to go forward.[2] (*Id.* at 2). Respondent subsequently acknowledged that the jurisdictional argument made at the September 29 hearing was erroneous and scheduled a replacement hearing for the following day, October 1, 2026. (ECF Nos. 15, 20). The Court permitted this second hearing to proceed in light of Respondent's acknowledgment of the clear error and subsequently discharged its Order to Show Cause.

On October 1, 2026, Petitioner appeared with counsel before an IJ for a second bond hearing. (Bond Hr'g Tr., ECF No. 25-1 at 2–3). Petitioner's counsel submitted a 224-page evidentiary packet containing, among other materials, documentation of Petitioner's immigration history, employment authorization, tax returns, medical records, pending criminal charges, state court pretrial assessment, sponsor arrangements, employment history and opportunities, and letters of support. (ECF No. 28.) Counsel argued that Petitioner did not present a danger or flight risk considering her lack of prior criminal history apart from the disputed September 13 incident,

[2] The Court explained that, even assuming Respondent was not equitably or judicially estopped from changing the asserted statutory basis for Petitioner's detention without explanation or notice to the Court, the Court had previously rejected the contention that a noncitizen who was paroled pursuant to 8 U.S.C. § 1182(d)(5)(A), resided in the United States for an extended period, and was subsequently arrested in the interior of the country could be re-detained without a bond hearing pursuant to § 1225(b)(1). (ECF No. 14 at 2–3); *see Rodriguez v. Rokosky*, No. 25-17419, 2025 WL 3485628, at *2 (D.N.J. Dec. 3, 2025); *Murillo-Castillo v. Florentino*, No. 25-16728, 2026 WL 1383062, at *5–6 (D.N.J. May 18, 2026); *but see Sanchez v. Soto*, No. 25-19082, 2026 WL 125576 (D.N.J. Jan. 16, 2026); *Arcos Tasigchana v. Soto*, No. 25-18252, 2026 WL 266170 (D.N.J. Feb. 2, 2026). The Court further explained that the Third Circuit's precedential decision in *Buele Morocho v. Warden Phila. FDC*, No. 26-1150, 2026 WL 2546223, at *8–10 (3d Cir. Aug. 28, 2026), supported this conclusion. Although *Buele Morocho* principally addressed detention under § 1225(b)(2), the Third Circuit held that noncitizens who have "lived in the United States for extended periods of time" without disqualifying criminal records are entitled to a bond hearing under the Due Process Clause. *Id.* Accordingly, even if Respondent's interpretation of § 1225(b) were correct, the Court concluded that Petitioner's detention without a bond hearing would likely violate the Due Process Clause as applied to her. (ECF No. 14 at 3).

employment and community ties, and concrete arrangements for housing and financial support upon release. (Bond Hr'g Tr., ECF No. 25-1 at 5–7).

The Government opposed bond. (*Id.* at 7–9). During argument, counsel for the Government again referenced *Matter of M-S-* and the Laken Riley Act, § 1226(c), and asserted that Petitioner was not eligible for release on bond notwithstanding the Government's position before this Court. Specifically, counsel stated:

> The people representing the Government in the U.S. District Court are not asserting *Matter of M-S* in any of these habeas cases. This is an example of one of the cases I mentioned earlier where they go to the District Court because **they want a hearing they're not entitled to,** and here we are. **This person is not eligible for release on bond**. Luckily for the public, she presents a danger and a flight risk, so she's not eligible for bond anyway, even in this second hearing.

(*Id.* (emphasis added)). The Government then argued that Petitioner's pending criminal charges demonstrated dangerousness because she "grabbed the victim's arm causing a laceration from her nails and damaged the victim's iPhone 17 causing it to become inoperable" and "iPhones are very expensive." (*Id.* at 8). Counsel added that there was no evidence that Petitioner was the victim and "even if she was the victim of domestic violence, she doesn't get to scratch a person and break their cell phone." (*Id.*). The Government further argued that Petitioner's "short time" in the United States, her untimely asylum application, and "[a]ll of the efforts she's taking to be released to the street again, rather than having any application adjudicated" supported a finding of flight risk. (*Id.* at 8–9).

When Petitioner's counsel questioned the Government's renewed reliance on categorical ineligibility, DHS counsel stated: "No, I'm not allowed to. I'm not raising that because I was told by the powers that be that I'm not allowed to say it. Even though it's applicable law binding on this Court, we have to pretend it's not." (*Id.* at 9). The IJ did not address any of these comments from the Government's counsel.

Following the parties' arguments, the IJ denied bond. (*Id.* at 10–11). With respect to dangerousness, the IJ relied on Petitioner's recent arrest and observed that, although Petitioner claimed to have been the victim of domestic violence, she had not submitted corroborating documentation beyond her own statement and that of her sister. (*Id.*). The IJ alternatively found that Petitioner had not established that she was not a flight risk. (*Id.*). Although acknowledging Petitioner's sponsor and friendships in the United States, the IJ cited her "relatively recent[]" entry, an untimely asylum application, and the absence of significant family ties to United States citizens or lawful permanent residents. (*Id.*).

On October 2, 2026, the Court granted Petitioner leave to amend her Petition to assert any claims arising from or related to the October 1 bond hearing. (ECF No. 21). Petitioner filed her Amended Petition on October 12, 2026, alleging that the replacement hearing failed to provide a fundamentally fair and individualized custody determination. (ECF No. 22). Respondent opposed the Amended Petition, arguing that the IJ afforded Petitioner constitutionally adequate process and that Petitioner's objections amounted to challenges to the IJ's discretionary weighing of the evidence, which this Court lacks jurisdiction to review under § 1226(e). (ECF No. 25 at 2–4). Respondent readily acknowledged that DHS counsel's comments concerning Petitioner's bond ineligibility were improper and stated that ICE had arranged training for her with an "emphasis on the parameters of appropriate communication on the record and facilitating a clear understanding of District Court orders." (*Id.* at 3). But the Government maintains that the hearing was nevertheless fair because counsel ultimately clarified that she was not advancing categorical jurisdictional arguments and that the IJ's decision rested on independent findings of dangerousness and flight risk. (*Id.* at 3).

Petitioner filed a Reply on October 26, 2026, maintaining that DHS's renewed invocation of categorical ineligibility and related statements, coupled with the IJ's failure to meaningfully address her proposed release conditions, rendered the replacement hearing fundamentally unfair. (ECF No. 26). Petitioner sought immediate release or, alternatively, another bond hearing with additional procedural safeguards. (*Id.* at 10). At the time the Court ordered her released on October 28, she had been detained for approximately forty-four days.

## II. STANDARD OF REVIEW AND JURISDICTION

District courts have jurisdiction under 28 U.S.C. § 2241 to hear claims that an immigration detainee is "in custody in violation of the Constitution or laws or treaties of the United States." § 2241(c)(3); *see also Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 439 (3d Cir. 2021); *Tuser E. v. Rodriguez*, 370 F. Supp. 3d 435, 440 (D.N.J. 2019). Petitioners have the burden to demonstrate that their detention violates the Constitution or federal law. *See, e.g.*, § 2241(c)(3); *Zumba v. Bondi*, No. 25-14626, 2025 WL 2753496, at *4 (D.N.J. Sept. 26, 2025); *Sarkisov v. Underwood*, No. 24-88, 2025 WL 1640826, at *1 (W.D. Pa. May 5, 2025).

As Petitioner was detained in New Jersey at the time she filed her Petition and challenges the legality of that detention on federal constitutional and statutory grounds, this Court has jurisdiction to consider her claims. For immigration habeas petitions under § 2241, exhaustion is not a statutory requirement, but a prudential one, and "may be excused where it would be futile, if the actions of the agency clearly and unambiguously violate statutory or constitutional rights, or if the administrative procedure is clearly shown to be inadequate to prevent irreparable harm." *Brown v. Warden Canaan USP,* 763 F. App'x 296, 297 (3d Cir. 2019) (quotation marks and citation omitted). Thus, the Court excuses any requirements to exhaust administrative remedies due to

futility and potential irreparable harm. *See, e.g.*, *Garcia Ortiz v. Henkey,* No. 26-00043, 2026 WL 948275, at *3 (D. Idaho Apr. 7, 2026) ("This Court will not require [Petitioner] to sit in an ICE detention facility for six months while he awaits a BIA decision." (alteration in original) (citation omitted)); *Tursunov v. Butler*, No. 26-00826, 2026 WL 2655077, at *2 (M.D. Pa. Sept. 9, 2026) (excusing exhaustion on futility grounds). Finally, while this Court does not have jurisdiction to review the IJ's discretionary decision to grant or deny bond, it may review whether a bond hearing was fundamentally unfair and thus violated the Due Process Clause of the Fifth Amendment. *See Zheng v. Rokosky,* 826 F. Supp. 3d 545, 553 (D.N.J. 2026) (citing *Ghanem v. Warden Essex Cnty. Corr. Facility*, No. 21-1908, 2022 WL 574624, at *2 (3d Cir. Feb. 25, 2022)). This "preserves a district court's inherent power to enforce its habeas orders by ensuring that the individualized bond hearings are not shams and otherwise comply with the detainee's due process rights." *Shonhai v. Lowe*, No. 24-229, 2026 WL 538865, at *10 (M.D. Pa. Feb. 26, 2026).

## III. DISCUSSION

As explained below, Petitioner was entitled to a fair bond hearing under the Due Process Clause of the Fifth Amendment. Because she did not get one after the Government had two opportunities to provide one, and because she had already been detained forty-four days, the Court concludes that immediate release is appropriate. And to the extent Petitioner is detained in the future, the Government must bear the burden of proof in any subsequent hearing.

The Third Circuit has recently affirmed that noncitizens like Petitioner, who have resided in the United States for an extended period without disqualifying criminal records, are entitled to a bond hearing under the Due Process Clause. *Buele Morocho*, 189 F.4th at 305–07. For that right to have any meaning, the hearing cannot be a sham. Thus, to satisfy due process, a noncitizen "(1) is entitled to factfinding based on a record produced before the decisionmaker and disclosed to

him or her; (2) must be allowed to make arguments on his or her own behalf; and (3) has the right to an individualized determination of his [or her] interests." *Ghanem*, 2022 WL 574624, at *2 (alteration in original) (footnote omitted).[3] These requirements presuppose an impartial decisionmaker. *See, e.g.*, *Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003) ("[I]t is well established that due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." (quotation marks and citation omitted)). Due process also requires that a decision be grounded in the evidence presented and accompanied by a statement identifying the reasons for the determination and the evidence relied upon. *See Goldberg v. Kelly*, 397 U.S. 254, 271 (1970). Absent these safeguards, the constitutional right to a bond hearing would be little more than an empty promise.

Whether a bond hearing was fundamentally fair is necessarily a fact-sensitive inquiry under a highly deferential standard of review. Nevertheless, where constitutional rights are implicated, deference cannot mean total abdication. Here, there is no dispute that the record was disclosed to Petitioner and that she was allowed to present arguments on her behalf. Thus, the question is whether she received an individualized determination from a neutral decisionmaker. A bond hearing is individualized "if it is not so arbitrary that it would offend fundamental tenets of due process," and "if there is a discernible rational basis for the underlying administrative decision, and the immigration judge applies the correct legal standards, that suffices." *Vasquez-Rosario v.*

[3] *See also Quinteros v. Warden Pike Cnty. Corr. Facility*, 784 F. App'x 75, 78 (3d Cir. 2019); *Abdulai v. Ashcroft*, 239 F.3d 542, 549–50 (3d Cir. 2001), superseded by statute on other grounds by REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 305, 310, as recognized in *Saravia v. Att'y Gen.*, 905 F.3d 729, 736 (3d Cir. 2018); *Zadvydas*, 533 U.S. at 721 (Kennedy, J., dissenting) ("Whether a due process right is denied when removable aliens who are flight risks or dangers to the community are detained turns, then, not on the substantive right to be free, but on whether there are adequate procedures to review their cases.").

*Noem*, No. 25-7427, 2026 WL 395711, at *2 (E.D. Pa. Feb. 12, 2026) (quotation marks and citation omitted). In determining whether release on bond is warranted under 8 U.S.C. § 1226(a), an IJ must assess whether the noncitizen presents a "danger to the community at large," a threat to national security, or a flight risk. *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006). Relevant considerations include the noncitizen's fixed address, length of residence in the United States, family ties and potential eligibility for lawful status, employment history, record of court appearances, criminal history, prior immigration violations, attempts to evade authorities, and manner of entry. *Id.* Notably, the Board of Immigration Appeals ("BIA") itself has recognized that IJs have "broad discretion" in weighing these factors and determining bond "*as long as the decision is reasonable*." *Id.* (emphasis added).

While Section 1226(e) bars courts from second-guessing an IJ's discretionary bond determination, it does not bar review of whether that determination complied with the Constitution. *Ortega Campoverde v. Warden York Cnty. Prison*, No. 20-1787, 2021 WL 2879505, at *4 (3d Cir. July 9, 2021). Discretion, however broad, must have a reasonable foundation. *See Carlson v. Landon*, 342 U.S. 524, 540–41 (1952). Nor would the Third Circuit's recognition of a constitutional right to an individualized bond hearing carry any force if courts could not determine whether the decisionmaker genuinely considered the evidence and issued a rational decision based on that evidence. *See Buele Morocho*, 189 F.4th at 305–07. The Court therefore reads § 1226(e) as permitting courts to determine whether there is a discernible rational basis in the record.[4] This

[4] Indeed, to interpret it otherwise would raise serious constitutional concerns because the "Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights." *Zadvydas*, 533 U.S. at 692 (quotation marks and citation omitted).

inquiry does not authorize the Court to reweigh evidence or reassess credibility. *See Ghanem*, 2022 WL 574624, at *3. Rather, it ensures that the IJ "actually consider[ed] the evidence and argument that a party presents," instead of acting "as a mere rubber-stamp." *Abdulai*, 239 F.3d at 549 (citation omitted).

Put differently, a due process right to a fair hearing necessarily means there is some, albeit low, evidentiary floor. The requirement of a discernible rational basis is analogous, in this limited respect, to the familiar (and highly deferential) substantial-evidence standard, under which a reviewing court also does not reweigh evidence or substitute its judgment for that of the factfinder, but simply asks whether the record contains more than a mere scintilla of evidence and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019). Where the record lacks such evidence, a challenge to that decision is not mere disagreement or an evidentiary quibble. It raises the more fundamental question of whether the proceeding afforded a genuinely neutral and individualized determination or was merely a fig leaf for a predetermined outcome.

Accordingly, the Court's analysis proceeds in two stages. The Court first concludes that the repeated improper statements by the Government's counsel at the second bond hearing tainted the hearing from the outset. The Court further concludes that the IJ's findings of danger and flight risk that no bond could ameliorate lacked a discernible rational basis in the record. Because Petitioner has already been detained forty-four days and proceeded through two bond hearings, the Court finds that immediate release is the appropriate remedy.

### A. The Government's Conduct Tainted Petitioner's Second Bond Hearing

The Court first addresses DHS counsel's conduct during Petitioner's second bond hearing on October 1. That hearing was intended to remedy the Government's acknowledged error at the

first hearing, where the Government argued that Petitioner was categorically ineligible for bond despite Respondent's representations to this Court that she was "undoubtedly" entitled to a bond hearing. Yet, at the replacement hearing, the Government's counsel again invoked the same categorical grounds for detention.

As detailed above, the transcript reveals more than a passing reference. The Government's counsel asserted that noncitizens like Petitioner were seeking "a hearing they're not entitled to"; that Petitioner was "not eligible for release on bond" and that "[l]uckily for the public" she also presented a danger and flight risk. (Bond Hr'g Tr., ECF No. 25-1 at 8–9). When Petitioner's counsel questioned whether DHS was again asserting categorical ineligibility, DHS counsel responded that she had been instructed not to advance that argument "by the powers that be" but maintained that it remained binding law on the IJ that "we have to pretend" did not apply. (*Id.* at 9). DHS counsel further argued that "[a]ll of the efforts she's taking to be released to the street again, rather than having any application adjudicated" demonstrated flight risk. (*Id.*).

These statements went far beyond zealous advocacy and were highly improper, reflecting an apparent disdain for the judiciary. As this Court has previously stated, immigration courts are administrative tribunals within the Department of Justice's Executive Office for Immigration Review, operating under authority delegated by the Attorney General. As such, they are plainly bound to follow orders of an Article III court. *Zheng*, 826 F. Supp. 3d at 556. The dismissive attitude and disdain for the Court expressed by the Government's counsel during the hearing is, quite frankly, unacceptable. The Constitution affords individuals the right to seek habeas relief, and compliance with this Court's orders is not optional. Counsel's statements reflecting her apparent personal views and disagreement with the law were plainly improper. Indeed, it is

precisely this type of conduct that reinforces this Court's prior stated concern as to whether anyone can receive a fundamentally fair bond hearing in the current environment. *Id.* at 559–60.

Read together, these statements suggest an effort by counsel to undermine the legitimacy of the court-ordered hearing itself, not merely advance an argument or preserve an objection. Counsel's acknowledgment that she was "not allowed to" advance categorical ineligibility makes these assertions particularly troubling. Such conduct not only raises substantial ethical concerns but also evidences a lack of professionalism that courts expect from counsel.

In addition, the Court is particularly troubled by counsel's suggestion that Petitioner's pursuit of judicial relief itself constituted evidence of flight risk. Petitioner sought habeas relief to obtain a hearing the Government had already conceded she was entitled to receive. Her exercise of that right cannot establish an intention to evade immigration proceedings. Indeed, the Third Circuit has explicitly held that noncitizens should not be penalized for pursuing lawful remedies. *See German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 212 (3d Cir. 2020).

The Third Circuit has emphasized that immigration proceedings must afford litigants the "dignity," "respect," "courtesy," and "fairness" expected in an American courtroom. *Cham v. Att'y Gen.*, 445 F.3d 683, 690–91 (3d Cir. 2006). And a procedural defect violates due process and warrants relief where it has the potential to affect the outcome even if it would not necessarily produce a different result. *See id.* at 694; *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 213 (3d Cir. 2017). Although those cases involved misconduct by IJs, rather than Government counsel, their principles inform the Court's assessment of whether the proceeding as a whole was fundamentally fair in this case.

The Court acknowledges that the IJ did not expressly adopt the improper statements and arguments from the Government's counsel. But the IJ neither corrected DHS counsel's renewed

assertions of categorical ineligibility nor expressly rejected these arguments or the suggestion that Petitioner's pursuit of judicial relief demonstrated flight risk. (*See* Bond Hr'g Tr., ECF No. 25-1 at 8–10). Indeed, it was Petitioner's counsel, not the IJ, who raised the impropriety of such statements and arguments. These statements and arguments went directly to the issues before the IJ and had the potential to influence her assessment of Petitioner's eligibility for release.

Respondent conceded these statements and arguments by the Government's counsel were improper and represented that ICE has arranged additional training concerning appropriate courtroom advocacy. (Gov't Resp., ECF No. 25 at 3). But subsequent training does not resolve the question of whether the second bond hearing was fundamentally fair.

The Court concludes that these repeated improper statements and arguments compromised the independent custody determination the replacement hearing was intended to provide. As such, the Court finds that the hearing was not fundamentally fair. Further, as discussed below, the concern of prejudice is reinforced by the IJ's limited explanation for her findings of dangerousness and flight risk. And certainly when considered together, these deficiencies substantially call into question whether Petitioner received the fundamentally fair and individualized determination required by due process.

**B. The IJ's Findings Lack a Discernible Rational Basis**

The Court's concerns regarding the fairness of Petitioner's bond hearing are reinforced by the IJ's findings of dangerousness and flight risk. Again, the Court is cognizant of its limited role in reviewing bond decisions and is not simply reweighing competing evidence. But even under the deferential standard articulated above, an individualized determination must have a discernible rational basis in the record. *Vasquez-Rosario*, 2026 WL 395711, at *2. Here, the IJ's cursory findings simply cannot be rationally reconciled with the evidence presented at the hearing.

The IJ's finding of danger rested exclusively on Petitioner's lone arrest arising from a domestic dispute in which she allegedly scratched her boyfriend's arm and damaged his cellphone. Even assuming that Petitioner was the aggressor, and not the victim as she claims, this was Petitioner's only reported criminal history during nearly five years of residence in the United States. (*See* ECF No. 28 at 164–65; Gov't Ex. A, ECF No. 6-1). Moreover, the municipal court had authorized her release. (*Id.*). Further, the record does not reflect any issuance of a protective order or restraining order.

The Court does not minimize domestic violence or suggest that an IJ should disregard pending criminal charges when assessing dangerousness. Nevertheless, the existence of a single arrest cannot by itself establish that an individual with no prior criminal history presents an ongoing danger to the community at large. Congress has expressly identified categories of offenses warranting mandatory detention under § 1226(c), while preserving individualized custody determinations for individuals detained under § 1226(a). To treat any arrest as sufficient, without placing it in the context of an individual's overall history, would effectively expand the mandatory-detention framework beyond what Congress prescribed. *See Tursunov*, 2026 WL 2655077, at *5 (finding a bond hearing fundamentally unfair when the IJ relied on dismissed criminal charges and "did not consider Petitioner's criminal history in context of his individual circumstances"); *Garcia Marquez v. Hernandez*, No. 26-02516, 2026 WL 2640693, at *4 (W.D. Wash. Sept. 8, 2026) ("[N]ot every criminal record would support a finding of dangerousness." (citation omitted)).

In fact, the BIA has instructed that, in assessing dangerousness, an IJ may consider "the alien's criminal record, including the *extensiveness* of criminal activity, the recency of such activity, and the *seriousness* of the offenses." *Matter of Guerra*, 24 I. & N. Dec. at 40 (emphasis added). Here, however, the IJ's decision reflects no meaningful consideration of either the

extensiveness or seriousness of Petitioner's criminal record. The IJ did not adequately explain how this isolated, disputed incident—which the Government's counsel described as Petitioner having "scratch[ed]" her then-boyfriend's arm with her fingernails, (Bond Hr'g Tr., ECF No. 25-1 at 8)—demonstrated that Petitioner is a "danger to the community at large" or a "threat to national security," *Matter of Guerra*, 24 I. & N. Dec. at 40, warranting continued detention, particularly where the state court had issued no restraining order or protective order and authorized her release. While the state court's decision as to detention is not binding on the IJ, it certainly provides context to the allegations.

The IJ's alternative finding of flight risk that no bond could ameliorate is even more difficult to reconcile with the record. The IJ relied on Petitioner's "relatively recent[]" entry into the United States, the untimeliness of her asylum application, and her lack of significant family ties to United States citizens or lawful permanent residents. (Bond Hr'g Tr., ECF No. 25-1 at 10). Yet Petitioner had lived in the United States for nearly five years, during which she established a substantial employment history, paid taxes, and developed significant community ties. (Bond Packet, ECF No. 28 at 38–40, 88–155). She worked as a nanny for approximately two and a half years, caring for young children, and also worked in the restaurant industry. (*Id.* at 39, 196–97; Bond Hr'g Tr., ECF No. 25-1 at 6). Her former employers, coworkers, and friends submitted numerous letters attesting to her work ethic, reliability, and character. (Bond Packet, ECF No. 28 at 195–223). She also presented a U.S. citizen sponsor willing to provide housing, financial support, transportation to immigration proceedings, and assistance complying with her immigration obligations, as well as offers of future employment. (*Id.* at 167, 177–82).

Perhaps most significantly, Petitioner's prior conduct demonstrates a clear intent and willingness to comply with immigration requirements even when doing so was inconvenient. After

relocating to New Jersey, Petitioner avers that she traveled to Florida in April 2022 to attend a mandatory in-person immigration reporting appointment. (*Id.* at 38). She also appeared for her biometrics appointment in July 2023, and the record identifies no failure to appear for her immigration proceedings. (*Id.*).

Although the IJ briefly acknowledged Petitioner's sponsor and friendships, she did not meaningfully address Petitioner's longstanding employment, history of paying taxes, or demonstrated compliance with immigration requirements, much less explain why the record as a whole supported a finding of flight risk that could not be addressed through reasonable bond or other conditions of release. (Bond Hr'g Tr., ECF No. 25-1 at 10). Nor did the IJ explain how the untimeliness of Petitioner's asylum application established an intention to abscond, particularly where the application remains pending and Congress expressly permits exceptions to the filing deadline. *See* 8 U.S.C. § 1158(a)(2)(D).

The Court reiterates that it is not simply reweighing competing evidence. Rather, the Court finds that the IJ's findings lack a discernible rational basis when considered against the record as a whole. Although an IJ need not discuss every piece of evidence in the bond package, the requirement of an individualized determination demands more than simply identifying a few isolated unfavorable facts while failing to meaningfully address material, and here overwhelming, contrary evidence directly bearing on the asserted risks. *See Garcia Marquez*, 2026 WL 2640693, at *4 (citing cases) ("An IJ must meaningfully engage with contrary evidence, and failure to do so is an abuse of discretion."); *Timbigamba v. FCI Berlin, Warden*, 836 F. Supp. 3d 430, 444 (D.N.H. 2026) ("While an IJ need not discuss ad nauseam every piece of evidence, the IJ may not simply ignore substantial testimonial and documentary proof." (quotation marks and citation omitted)).

Here, the IJ's findings do not reflect the meaningful consideration of the record that due process requires.

This concern is particularly acute here, where the Government's counsel repeatedly questioned Petitioner's eligibility for bond and advanced improper arguments concerning her pursuit of judicial relief. Considered together, the Government's conduct and the deficiencies in the IJ's stated reasoning call into question whether Petitioner received a genuinely individualized determination by a neutral decisionmaker, as due process requires. Indeed, on this record, no neutral arbiter could have found Petitioner to be a flight risk or danger justifying denial of bond.

**C. Release is the Appropriate Remedy**

Ordinarily, the remedy for a procedurally defective bond hearing is a new hearing with additional procedural safeguards. Here, however, Petitioner has already received two bond hearings. The first was rendered inadequate by the Government's admittedly erroneous jurisdictional arguments, and the second—arranged specifically to cure that error—was again tainted by improper statements and arguments. Moreover, as explained above, the IJ failed to meaningfully consider the evidence presented and rendered a decision without a discernible rational basis. As such, the second bond hearing was constitutionally inadequate.

Petitioner had been detained for forty-four days when the Court ordered her release on October 28, 2026. Although that period alone would not necessarily render her detention unconstitutional had she received prompt adequate process, *see generally Borbot v. Warden Hudson Cnty. Corr. Facility,* 906 F.3d 274 (3d Cir. 2018), it is significantly prolonged given the repeated failures to provide a constitutionally adequate bond hearing. Under these circumstances, the Court declines to afford the Government yet another opportunity to correct deficiencies of its own making while prolonging Petitioner's deprivation of liberty. The Court therefore concludes

that immediate release, rather than another bond hearing, is the appropriate remedy. *See Zheng*, 826 F. Supp. 3d at 560–64.

This relief does not preclude the Government from ever seeking to re-detain Petitioner. However, given the length of her detention without adequate process, any renewed detention must be supported by an individualized custody determination at which the Government bears the burden of establishing, by clear and convincing evidence, that Petitioner presents a danger to the community or a flight risk. *See German Santos*, 965 F.3d at 213–14.

**CONCLUSION**

The Constitution entitles Petitioner to a fair hearing in which the decision to detain a person is based on an impartial review of the evidence. And the hearing must be provided within a reasonable period of time. Here, the Government had two opportunities to provide Petitioner with such a hearing and failed both times. Having already been detained for forty-four days, Petitioner should not have to remain in detention while the Government is given a third opportunity to get it right. For these reasons, the Court concludes that Petitioner's release is the appropriate remedy.

Christine P. O'Hearn

**Christine P. O'Hearn**
**United States District Judge**

Dated: November 16, 2026